{¶ 49} I must respectfully dissent from the opinion of the majority. I disagree with the majority's analysis of appellant's first assignment of error regarding the admissibility of Robin Stewart's taped statement given at the hospital.
 {¶ 50} Prior to trial, defense counsel filed a motion to suppress this statement, and a hearing was held. The trial court denied the motion to suppress, permitting the statement to be used at trial.
 {¶ 51} At trial, outside of the presence of the jury, Robin Stewart took the witness stand and asserted her Fifth Amendment right against self-incrimination. Thereafter, in front of the jury, a tape of the interview with Robin Stewart was played.
 {¶ 52} In order for a statement of a co-defendant to be admitted against a defendant in a criminal trial, there are two important safeguards that must be satisfied. The first is the rules of evidence generally prohibiting hearsay statements.[5] The second is the Confrontation Clause of the Sixth Amendment to the United States Constitution.[6]
 {¶ 53} Although Robin Stewart's statement was hearsay, it would fall within a hearsay exception. Evid.R. 804(B)(3) permits statements to be admissible if they are "statements against interest." Since her statement subjected her to criminal liability, it would be admissible as a statement against interest.[7]
 {¶ 54} However, in order for a statement of a co-defendant to be admitted without violating the Confrontation Clause, the statement must "contain adequate indicia of reliability."[8] These statements are presumptively unreliable.[9] However, this presumption may be rebutted.[10] Therefore, the burden is on the state to demonstrate that the statement contained an indicia of reliability.
 {¶ 55} The trial court found that there was an indicia of reliability in Robin Stewart's statement. I disagree.
 {¶ 56} I am deeply troubled by the fact that Robin Stewart had narcotics in her system when she gave this statement. At the suppression hearing, the parties stipulated to the admission of a transcript of testimony of Dr. Frank Kousaie from a suppression hearing in the trial of Robin Stewart. Dr. Kousaie works at Robinson Memorial Hospital, where Robin Stewart was taken for treatment and the statement in question was given. Dr. Kousaie reviewed the medical records of Robin Stewart and testified to the following medical treatments she received on October 30, 2000, the day the statement was given. He testified that Ms. Stewart received 12.5 milligrams of Phenergan at 8:40 a.m. He further testified that Phenergan has sedative properties. He testified that at 10:45 a.m. Ms. Stewart received fifty milligrams of Fentanyl, a synthetic narcotic that is eighty times more potent than morphine. He testified that Ms. Stewart received five grams of morphine at 2:40 p.m. He also testified that a toxicology report taken at 8:39 a.m. showed that Ms. Stewart had an indeterminate amount of "obiates or narcotic analgesics" already in her system. Lieutenant Stein testified at the suppression hearing that Robin Stewart was given her Miranda rights at 4:35 p.m., after which the statement was given.
 {¶ 57} Dr. Kousaie testified that all of the drugs given to Robin Stewart have a fairly long half-life. Specifically, he testified that Phenergan has a half-life of four to six hours, Fentanyl has a half-life of two hours, and morphine has a half-life of four to six hours. He also testified that Ms. Stewart lost blood as a result of her injuries. Dr. Kousaie testified that based on the cumulative effect of the drugs in her system, he could not have asked Ms. Stewart for her informed consent to do a medical procedure.
 {¶ 58} The state cross-examined Dr. Kousaie regarding his expertise in the area, whether Robin Stewart could have given consent on the day in question, and whether he had listened to Ms. Stewart's taped statement. At the suppression hearing, Lieutenant Stein testified that Ms. Stewart was "awake and alert." He also testified, during the suppression hearing in the trial of Robin Stewart, a transcript of which was stipulated to at the suppression hearing in this case, that he had received permission from security officers at the hospital, who had talked to the attending doctor. However, the state presented no medical evidence regarding the effect that the drugs in Robin Stewart's system had on her memory and on her ability to accurately convey details of past events.
 {¶ 59} The defense provided extensive medical evidence regarding the presence of various narcotics in Robin Stewart's system, and the effect of those narcotics on a person's mental status. The state did not present any medical evidence to contradict this testimony. Under the indicia of reliability analysis of Madrigal, the statement was presumptively unreliable. The state had the burden of presenting evidence to rebut that presumption. This was not done.
 {¶ 60} On the morning of the day in question, Robin Stewart was shot with a handgun during an alleged burglary. She then fled the scene and hid in a van. When found by the police, she was transported to the hospital. At the hospital, she received medical treatment, which included being given numerous narcotics. That same afternoon, only two hours after receiving a dose of morphine, the police conducted the taped interview. These circumstances, taken together, do not tend to show that there was an indicia of reliability in the statement.
 {¶ 61} The majority opinion from a separate panel of this court ruled that a different trial court did not err by admitting Robin Stewart's statement in her own trial.[11] This panel held that there was sufficient evidence presented that Robin Stewart was coherent when she made her statement. However, the statement was being used against Stewart in her own trial. Therefore, the state was only required to show that she knowingly and voluntarily waived her Miranda rights. The "indicia of reliability" standard of Madrigal was not applicable.
 {¶ 62} The trial court found the statement contained an indicia of reliability. An independent review of Robin Stewart's statement contradicts the trial court's finding. In her statement, Robin Stewart does implicate herself along with David Clark and appellant. However, she did attempt to shift some of the blame for the events to David Clark and appellant. Shifting blame or minimizing one's involvement in criminal activity minimizes the reliability of the statement.[12] Ms. Stewart stated that David Clark would not tell her where they were going when he picked her up in Cleveland to go to Kent. She stated that appellant and David Clark planned the incident. She also stated that David Clark gave her the jammed gun because "he knew I wouldn't like shoot the thing." She stated she never pointed the gun at anyone. Finally, when asked why she participated in the events, Robin Stewart stated: "[y]ou know what. I don't know. If I would have known. If they would have told me before I left my house I would not have went." These statements can only be construed as an attempt to minimize her involvement in the incident and shift the blame to David Clark and appellant.
 {¶ 63} A review of the Robin Stewart's statement indicates it is even more unreliable due to the numerous leading questions by the police investigators.
 {¶ 64} "`[I]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte
affidavit practice — that is, when the government is involved inthe statements' production, and when the statements describe past events that have not been subject to adversarial testing.'"[13]
 {¶ 65} Many of Robin Stewart's responses were "um hum" or "yeah," merely agreeing with the statements of the investigators. Certain times, when Ms. Stewart stated she did not know the answer to a question, the investigator would suggest the answer, and Ms. Stewart would agree. While leading questions do not, per se, render a statement unreliable, such a statement is not as reliable as a statement that is given in the narrative without any "suggestions" from the questioning officer.
 {¶ 66} The statement of co-defendant Robin Stewart was inadmissible, as the state did not meet its burden of showing that it contained a sufficient indicia of reliability to be used against Clark.
 {¶ 67} Since the admissibility of Robin Stewart's statement violated appellant's Confrontation Clause rights, the final analysis on this issue is to determine whether the error was harmless beyond a reasonable doubt.[14] The admissions of co-defendant Robin Stewart, which implicated appellant, could have carried a great deal of weight in the jury's decision to convict appellant of complicity to aggravated burglary.
 {¶ 68} Complicity is codified in R.C. 2923.03, which states, in relevant part:
 {¶ 69} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 70} "(1) Solicit or procure another to commit the offense;
 {¶ 71} "(2) Aid or abet another in committing the offense;
 {¶ 72} "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;"
 {¶ 73} In her statement, Robin Stewart refers to appellant as "Sahid," which was a name provided by the investigators. She states that the burglary was planned. She states that appellant gave David Clark the gun to commit the burglary. She also states that appellant acted as a lookout during the burglary.
 {¶ 74} Essentially, Robin Stewart's statement was a confession. When an individual is being tried on a complicity theory, the improper admission of a co-defendant's confession to the underlying crimes is inherently prejudicial. Accordingly, the error in admitting Robin Stewart's statement was not harmless beyond a reasonable doubt.
 {¶ 75} Based on the foregoing, I would reverse the judgment of the trial court and remand this matter for further proceedings.
[5] State v. Madrigal (2000), 87 Ohio St.3d 378, 384.
[6] Id.
[7] Evid.R. 804(B)(3).
[8] State v. Madrigal, 87 Ohio St.3d 378, paragraphs one and three of the syllabus.
[9] Id. at 386, quoting Lilly v. Virginia (1999), 527 U.S. 116,131.
[10] Id. at 387, quoting Lee v. Illinois (1986), 476 U.S. 530,543.
[11] State v. Stewart (Dec. 27, 2002), 11th Dist. No. 2001-P-0035.
[12] State v. Madrigal, 87 Ohio St.3d at 387.
[13] (Emphasis added.) Id. at 387, quoting Lilly v. Virginia (1999),527 U.S. 116, 137.
[14] State v. Madrigal, 89 Ohio St.3d at 388.